# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 08-02835-TLM** |
| **BRADLEY FRANK WHEELER,** | ) | |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **RICHARD CRAWFORTH,** | ) | |
| **Chapter 7 Trustee,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 09-06038-TLM** |
| | ) | |
| **BRADLEY FRANK WHEELER,** | ) | |
| **LISA L. GREGERSON, L&B** | ) | |
| **PROPERTIES, INC., and BW** | ) | |
| **PROPERTIES, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

In this adversary proceeding the chapter 7 trustee ("Trustee") seeks to avoid

certain transfers by Bradley Wheeler ("Debtor") and his closely-held business,

BW Properties, LLC, to Defendants Lisa Gregerson and L&B Properties, Inc.

MEMORANDUM OF DECISION - 1

under § 548(a)(1)(A).[1]   Trustee further seeks an order denying Debtor's discharge

under § 727(a)(2) – (5).[2]  This Memorandum of Decision disposes of the matter

and constitutes the Court's findings of fact and conclusions of law.  Fed. R. Bankr.

P. 7052(a).

**FACTS[3]**

Debtor and Defendant Lisa Gregerson are husband and wife.  Together,

they own and control two closely-held entities — BW Properties, LLC ("BW")

and L & B Properties, Inc. ("L & B").

**A.     BW Properties, LLC**

Debtor organized BW in 2004 as a limited liability company.  Although

Gregerson was not a member of BW at its inception, she was added as a member

of the company some time thereafter and was a member of BW at all times

relevant to this proceeding.[4]  BW was created as a vehicle for selling and buying

---

[1]  Unless otherwise indicated, all chapter, section, or other statutory references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Code"), and all rule references are to the Federal
Rules of Bankruptcy Procedure 1001–9037.

[2]  In his complaint, as amended, Trustee also asserted a cause of action under § 547 for
alleged preferential transfers.  At trial, the Court dismissed Trustee's § 547 cause of action on the
Defendants' oral motion for judgment on partial findings under Federal Rule of Civil Procedure
52(c), as incorporated by Rule 7052.

[3]  All factual findings based on testimony reflect and incorporate the Court's evaluation
of the credibility and veracity of the witnesses, the Court having carefully listened to and
observed them during trial, and also reflects the weight ascribed to their testimony.  This is true
even where the Court does not make specific reference to credibility in addressing the facts.

[4]  Debtor testified that at some unspecified point in time BW had another member, Jeff
(continued...)

MEMORANDUM OF DECISION - 2

real property, but, after obtaining a contractor's license in 2006, the company

largely limited its business to small-scale construction and contractor work.

### B.    L & B Properties, Inc.

Debtor and Gregerson incorporated L & B in April 2005.  Debtor and

Gregerson have 49% and 51% ownership interests in L & B, respectively, and are

listed as secretary and president of the corporation.  L & B was created to

purchase, hold, and sell real property.  When BW received its contractor's license

in 2006, L & B began hiring BW to do construction work on properties it owned.

### C.    State Court Litigation

In 2006, Debtor entered into a business relationship with Jonathan and

Barbara Ball in order to develop a parcel of real property owned by the Balls.  As

part of this relationship, Debtor contracted to build a new home for the Balls.

During the course of the project, the relationship between Debtor and the Balls

deteriorated, resulting in disputes concerning payment for Debtor's work.  Debtor,

acting through BW, recorded a lien on the Balls' property for money he believed

he was still owed under contract.  The Balls responded by suing Debtor and BW in

state court on January 29, 2007.  *See* Ex. 107.  In turn, Debtor and BW filed

several counterclaims against the Balls.  On November 13, 2008, after a lengthy

---

[4](...continued)
Hill.  However, he further explained that Hill disassociated from BW before the occurrence of the
events pertinent to this proceeding.

MEMORANDUM OF DECISION - 3

trial, a jury returned a verdict in the Balls' favor.  Based on the jury verdict, on

November 28, 2008, the state court entered a $55,524 judgment against Debtor

and a $12,075 judgment against BW.  Ex. 133.[5]

Meanwhile, on August 21, 2008, during the pendency of the state court

litigation, Debtor executed a quitclaim deed conveying to Gregerson his interest in

real property located in Pony Acres Estates at 11899 Orchard Avenue, Nampa,

Idaho ("Orchard Property").  Ex. 114.[6]  The deed was recorded on August 22,

2008.  *Id.*

Debtor, and Gregerson acting on behalf of Debtor, also effected a number

of transfers between the date the jury verdict was returned and entry of judgment

on that verdict.  On November 15, Debtor personally received a $10,000 check

from Kenneth Joe Wheeler as a gift, which Debtor deposited into an L & B bank

account two days later.  *See* Ex. 117.  On November 17, Gregerson went to the

Idaho Department of Motor Vehicles ("DMV") and transferred title to a 1981 Ford

dump truck, a 1982 Ford pick-up truck, a 1993 Jeep Wrangler, and a 1998 FTWD

travel/camp trailer from BW to L & B.  *See* Exs. 122, 123, 124, and 126.  The

---

[5]  In the form of judgment, the state court ordered that any amounts paid on, or otherwise received toward, the BW judgment also be credited to the judgment against Debtor personally. *See* Ex. 133.

[6]  Oddly, the record contains a second, *post*-bankruptcy quitclaim deed, dated January 6, 2009, by which Debtor purports to convey to Gregerson the same parcel of property. Ex. 145. No explanation was given for the second deed, and the Court gives it no effect.

MEMORANDUM OF DECISION - 4

gross sales price listed on the applications for certificate of title for each of the

three vehicles and the trailer was "0.00." *Id.* At the same time, Gregerson also

added her name to Debtor's on the certificates of title for a 1999 Yamaha

motorcycle, a 2003 Honda motorcycle, and a 2006 Honda motorcycle. *See* Exs.

127, 129, and 131.

On December 11, 2008, after the state court judgment had been entered and

after Debtor and Gregerson met with bankruptcy counsel, Gregerson returned to

the DMV and had Debtor's name removed from the certificates of title for the

three motorcycles, leaving her as the sole owner of each. *See id.*

### D.    Bankruptcy

The following day, on December 12, 2008, Debtor filed an individual

petition for relief under chapter 13. In his schedules, Debtor listed an "equitable

interest" in the Orchard Property with a value of $225,000, and ownership

interests in BW and L & B, to which he ascribed no value.[7] He also listed the

2006 Honda motorcycle, but not the 1999 Yamaha and 2003 Honda. In his

statement of financial affairs ("SOFA"), Debtor did not disclose the conveyance of

his interest in the Orchard Property, his receipt and deposit of the $10,000 check,

or the removal of his name from the certificates of title for the 1999 Yamaha, the

---

[7]   The Court takes judicial notice of all the filings of record in Debtor's bankruptcy case,
Case No. 08-02835-TLM. *See* Fed. R. Evid. 201.

MEMORANDUM OF DECISION - 5

2003 Honda, and the 2006 Honda motorcycles.  On December 24, 2008, Debtor's

bankruptcy case was converted to one under Chapter 7 on Debtor's request.

Debtor later amended his schedules.  He removed his interest in the

Orchard Property from Schedule A and added the 1999 Yamaha and 2003 Honda

motorcycles to Schedule B, with values of "0.00."  Debtor also amended his

SOFA to reflect the $10,000 gift he received from Kenneth Wheeler.  Debtor's

amended SOFA lacked any information concerning conveyance of his interest in

the Orchard Property, deposit of the $10,000 into the L & B account, or the

removal of Debtor's name from the motorcycle certificates of title.

### E.   Garrity Property

At the time of filing Debtor owned a parcel of commercial real property

located at 1116 Garrity Boulevard, Nampa, Idaho ("Garrity Property").[8]

Beginning in April 2006, Debtor leased the Garrity Property to Marcus Tam and

Yiju Liang (aka Amy Liang).  *See* Ex. 210.  In conjunction with the lease

agreement, Tam and Liang also acquired an option to purchase the Garrity

Property.  *See id.*  By their terms, both the lease and option were set to expire on

October 31, 2008.

On October 30, 2008, one day before the option was to expire, Wheeler and

_____

[8]  Debtor acquired the Garrity Property before his marriage to Gregerson in December 2006.

MEMORANDUM OF DECISION - 6

Tam entered into another option agreement regarding the Garrity Property. *See* Ex. 210. Tam paid Debtor $20,000 for the option, which had an expiration date of December 1, 2008. Included in the option was a provision that required Debtor to assign to Tam, upon exercise of the option, his interest in a lease with Canyon Outdoor Media, covering a tract of land on the Garrity Property on which Canyon Outdoor Media, LLC maintained an advertising billboard. *See* Ex. 100.[9]

On December 13, 2008, the day following Debtor's bankruptcy filing, Gregerson entered into an agreement to lease the Garrity Property to Liang for an additional three years. Ex. 140 ("Lease"). Under the December 13 Lease, Liang was obligated to pay Gregerson monthly rent of $1,750. Tam and Liang paid rent under the Lease for five months, totaling $8,750. *See* Ex. 143.

At the same time, Gregerson also granted Liang a 4-year option to purchase the Garrity Property. Ex. 139 ("Option"). Tam and Liang paid Gregerson $16,000 for the Option. Payment of the $16,000 was made in three separate checks of $6,000, $5,000, and $5,000, which Gregerson cashed. *See* Ex. 139.

In conjunction with the Option and Lease, Tam and Liang also executed an 18-month promissory note ("Note") in favor of Gregerson for $10,417.41 with

---

[9] At trial, a November 25, 2008, "Assignment of Leases" was admitted which appeared to assign Debtor's interest in the Canyon Outdoor lease to Tam. Ex. 132. Debtor testified that the November 25 assignment was executed in contemplation of the sale of the Garrity Property to Tam under the October 30 option. However, the sale never closed and Debtor received no consideration for the assignment.

MEMORANDUM OF DECISION - 7

interest compounded annually at 12%. *See* Ex. 140. The Note was for unpaid

property taxes on the Garrity Property for 2006–2008. It called for monthly

payments of $635.27 beginning on or before April 1, 2009. Tam and Liang made

two payments on the Note in March and April of 2009. *See* Ex. 143.

Although Debtor owned the Garrity Property, and according to testimony

was present on the day after Debtor's bankruptcy was filed when the Lease,

Option, and Note were executed, it was Gregerson, not Debtor, who was listed as

"owner" in the documents, and it was Gregerson alone who signed the same.

Debtor listed the Garrity Property in his original and amended Schedule A.

In his SOFA Debtor also disclosed $19,200 in yearly rental income for 2007 and

2008. And in his amended SOFA he disclosed the $20,000 he received from Tam

and Liang for the October 30 option. He did not, however, list any income from

real property in his schedule of current income, Schedule I. Nor did Debtor list

any executory contracts, such as the Lease and the Canyon Outdoor lease, in his

original or amended schedules.

**DISCUSSION AND DISPOSITION**

    **A.**    **Transfer avoidance under § 548**

Trustee first seeks to invoke § 548(a)(1)(A) to avoid certain transfers made

MEMORANDUM OF DECISION - 8

prior to Debtor's bankruptcy filing.[10]  Section 548(a)(1)(A) permits Trustee to

> avoid any transfer (including any transfer to or for the benefit of an
> insider under an employment contract) of an interest of the debtor in
> property, or any obligation incurred by the debtor, that was made or
> incurred on or within 2 years before the date of filing of the petition, if
> the debtor voluntarily or involuntarily —
> (A) made such transfer or incurred such obligation with actual intent
> to hinder, delay, or defraud any entity to which the debtor was or
> became, on or after the date that such transfer was made or such
> obligation was incurred, indebted[.]

Trustee bears the burden of proving, by a preponderance of the evidence, each of

the elements under § 548(a)(1)(A) in order to avoid a fraudulent transfer.  *See*

*Murrietta v. Fehrs (In re Fehrs)*, 391 B.R. 53, 73 (Bankr. D. Idaho 2008).

Courts often look to the circumstances surrounding a transfer to determine

whether there was actual intent to hinder, delay or defraud creditors.  As the Ninth

Circuit has explained:

> It is often impracticable, on direct evidence, to demonstrate an actual
> intent to hinder, delay or defraud creditors.  Therefore, as is the case
> under the common law of fraudulent conveyance, courts applying
> Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from
> the circumstances surrounding the transfer, taking particular note of
> certain recognized indicia or badges of fraud.

> Among the more common circumstantial indicia of fraudulent intent
> at the time of the transfer are: (1) actual or threatened litigation against
> the debtor; (2) a purported transfer of all or substantially all of the
> debtor's property; (3) insolvency or other unmanageable indebtedness

---

[10]   In his amended complaint, Trustee alleges causes of action under § 548(a) and (b)
generally.  When asked at trial to identify precisely the nature of his cause of action, Trustee's
counsel indicated to the Court that Trustee's claims were limited to transfers made with actual
intent to hinder, delay or defraud pursuant to § 548(a)(1)(A).

MEMORANDUM OF DECISION - 9

on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer (5) retention by the debtor of the property involved in the putative transfer.

The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose. Thus, once a trustee establishes indicia of fraud in an action under section 548(a)(1), the burden shifts to the transferee to prove some "legitimate supervening purpose" for the transfers at issue.

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805–06 (9th Cir. 1994)

(quoting *Max Sugarman Funeral Home v. A.D.B. Investors*, 926 F.2d 1248,

1254–55 (1st Cir. 1991)).

### 1.    Quitclaim deed

Trustee asserts that the August 21, 2008, quitclaim deed conveying all of

Debtor's interest in the Orchard Property to Gregerson was a fraudulent transfer

under § 548(a)(1)(A).

"Transfer" is defined broadly by the Code as "each mode, direct or indirect,

absolute or conditional, voluntary or involuntary, of disposing of or parting with

— (i) property, or (ii) with an interest in property." Section 101(54)(D). The

quitclaim deed to Gregerson constitutes a "transfer" of Debtor's property under

the Code. That transfer occurred, for purposes of § 548, when the quitclaim deed

was recorded on August 22, 2008, approximately four months before Debtor filed

his bankruptcy petition, well within the two-year time frame contemplated by

MEMORANDUM OF DECISION - 10

§ 548.  *See* § 548(d)(1); *Fehrs*, 391 B.R. at 73–74.  Thus, the sole remaining issue is whether the deed was executed with actual intent to hinder, delay or defraud creditors.

Here, several badges of fraud surrounded execution of the quitclaim deed. First, the marital relationship between Debtor and Gregerson, while not creating a presumption of fraudulent intent, certainly invites close scrutiny of the transfer. Second, Debtor was defending against the Balls' lawsuit, a lawsuit in which Gregerson was not personally a party, at the time the deed from Debtor to Gregerson was executed.  Third, Debtor's transfer of his interest in the property was on paper only.  Debtor received no consideration for the transfer and he retained possession and use of the property with Gregerson.  In fact, Debtor's original schedules indicate that at the time of filing Debtor considered himself to have an "equitable interest" in the property, the August 22, 2008, quitclaim deed notwithstanding.  Lastly, there is no mention of the transfer in either Debtor's original or amended SOFA.

Gregerson and Debtor claim that the purpose of the quitclaim deed was to obtain a residential construction loan secured by the equity in the Orchard Property, arguing that this was a loan they would have been unable to obtain had Debtor's name been on the title to the property given his credit history and the

MEMORANDUM OF DECISION - 11

pending lawsuit.[11]  In essence, by removing the property from the reach of Debtor's potential judgment creditors, Gregerson and Debtor were able to use the property as leverage for securing additional financing.  Such a purpose is insufficient to overcome the indicia of fraud surrounding the quitclaim deed.  The Court concludes this is a transfer with actual fraudulent intent that Trustee may avoid under § 548(a)(1)(A).

### 2. $10,000 deposit

Next, the Court addresses the $10,000 Debtor received from Kenneth Wheeler, and subsequently transferred to L & B on November 17, 2008.  The transfer to L & B shares many of the badges of fraud that accompanied execution of the quitclaim deed.  As a 49% owner, with Gregerson owning the other 51%, Debtor had a close relationship with L & B.  At the time the $10,000 was deposited in the L & B account, the jury in the Ball state court litigation had returned a verdict against Debtor.  As co-owner of L & B, Debtor continued to exercise control over the $10,000, though those funds were nominally held by L & B.  And, although Debtor disclosed the $10,000 gift in his amended SOFA, there is no disclosure of the subsequent transfer to L & B in either his original or amended SOFA.  When considered together, these circumstances evidence an

---

[11]  Gregerson testified that she and Debtor executed the deed at the insistence of the potential lender.

MEMORANDUM OF DECISION - 12

actual intent to remove the $10,000 from the reach of Debtor's creditors and, in particular, the Balls.

Debtor contends that the $10,000 transfer to L & B was a "loan." However, he provided no documentation to support that assertion and, when questioned, was unable to clearly describe the terms of the purported loan. Additionally, he did not list any promissory notes or loan receivables in his bankruptcy schedules. Because Trustee met his initial burden of establishing indicia of fraud, the onus was on Debtor, as a principal of L & B, to show that there was a legitimate loan transaction. He failed to meet this burden.

The Court concludes that Trustee may avoid the $10,000 transfer to L & B under § 548(a)(1)(A).

### 3.    Motorcycles

The evidence demonstrates, and the Court concludes, that the removal of Debtor's name from the certificates of title for the 1999 Yamaha, 2003 Honda, and 2006 Honda motorcycles the day before Debtor filed his petition also constitute fraudulent transfers under § 548(a)(1)(A).

By having his name removed from the certificates of title, Debtor parted with, and thus transferred, his interests in the motorcycles.[12] That transfer

---

[12] *See Gugino v. Ortega (In re Pierce)*, 428 B.R. 524, 529 (Bankr. D. Idaho 2010) ("When the State of Idaho issues a new certificate of title showing a different "owner," a transfer has occurred for bankruptcy purposes from the owner listed in the former certificate to the owner
(continued...)

MEMORANDUM OF DECISION - 13

occurred the day before the petition date. Debtor transferred his interests into Gregerson's name only, for no consideration; a judgment had already been entered against him in the Ball state court litigation; and he continued to exercise possession and control of the motorcycles despite the transfers. No legitimate supervening purpose for the transfer has been shown. Trustee may avoid the transfers of Debtor's interests in the 1999 Yamaha, 2003 Honda, and 2006 Honda motorcycles under § 548(a)(1)(A).

### 4.    Vehicle and equipment transfers from BW to L & B

The final category of transfers Trustee seeks to avoid include those of BW's interests in certain vehicles and equipment — *i.e.*, the 1981 Ford dump truck, 1982 Ford pick-up truck, 1993 Jeep Wrangler, and 1998 FTWD travel/camp trailer — to L & B, effected by Gregerson on November 17, 2008. Trustee acknowledges that his avoidance powers under § 548(a)(1)(A) are limited to transfers of *Debtor's* interests in property, and that BW, not Debtor, was listed as owner on the certificates of title for the subject vehicles and trailer at the time of transfer. However, Trustee seeks to "pierce the veil" of BW and have the LLC form of that entity disregarded. Trustee argues that if BW and Debtor are treated as one and the same, the transfers of BW's interests in the vehicles and trailer to L

---

[12] (...continued)
listed in the new certificate.") (citing *Gugino v. Knezevich (In re Pegram)*, 395 B.R. 692, 696 (Bankr. D. Idaho 2008)).

MEMORANDUM OF DECISION - 14

& B would constitute transfers of Debtor's interests for purposes of § 548(a)(1).

Thus, as a threshold issue the Court must consider Trustee's veil piercing claim.

### a.     Veil-piercing

State law controls whether it is appropriate to pierce the corporate veil.

*Miller Ave. Prof'l & Promotional Servs., Inc. v. Brady (In re Enterprise*

*Acquisition Partners, Inc.)*, 319 B.R. 626, 634 (9th Cir. BAP 2004).  Under Idaho

law, courts may disregard the corporate form if two requirements are met.  First,

there must be a unity of interest and ownership such that the separate personalities

of the corporation and the individual no longer exist, and second, failure to treat

the acts of the corporation as those of the individual would lead to an inequitable

result or would sanction a fraud or promote injustice.  *Fetty v. DL Carlson*

*Enterprises, Inc. (In re Carlson)*, 426 B.R. 840, 850 (Bankr. D. Idaho 2010)

(citing *VFP VC v. Dakota Co.*, 109 P.3d 714, 723 (Idaho 2005)).  While Idaho

cases addressing veil piercing generally deal with corporations, this Court has

concluded that the equitable principle of veil piercing also applies in the context of

limited liability companies.  *See Elsaesser v. Cougar Crest Lodge, LLC (In re*

*Weddle)*, 353 B.R. 892, 897–98 (Bankr. D. Idaho 2006) (citing *Fisher v. Hamilton*

*(In re Teknek, LLC)*, 343 B.R. 850, 863 n.6 (Bankr. N.D. Ill. 2006) and *AE Rest.*

*Assocs., LLC v. Giampietro (In re Giampietro)*, 317 B.R. 841, 845–46 (Bankr. D.

MEMORANDUM OF DECISION - 15

Nev. 2004)).[13]

"[A]n action to pierce the corporate veil is 'not itself an independent . . .

cause of action, but rather is a means of imposing liability on an underlying cause

of action.'" *Semmaterials, L.P. v. Alliance Asphalt, Inc.*, 2008 WL 161797, at *3

(D. Idaho Jan. 15, 2008) (quoting *Peacock v. Thomas*, 516 U.S. 349, 354 (1996));

*see also Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1251–52 (9th Cir. 2010)

(interpreting California law).  As the Idaho Supreme Court has explained:

> Piercing the corporate veil is "[t]he judicial act of imposing personal
> liability on otherwise immune corporate officers, directors, and
> shareholders for the corporation's wrongful acts."  The theory allows
> the fact finder to disregard the corporate form, thereby making
> individuals liable for corporate debts or making corporate assets
> reachable to satisfy obligations of the individual.

*VFP VC*, 109 P.3d at 723 (internal citations omitted).

Here, Trustee is not attempting to use veil-piercing in the traditional sense.

He does not seek to impose personal liability on Debtor for the acts of BW.  Nor is

he alleging that the assets of BW should be used to satisfy a particular personal

liability of Debtor.  Indeed, Trustee is not seeking to recover, under § 548, from

---

[13]  Although the factors considered in corporate veil piercing cases can be applied in the
LLC context, those factors may apply with different weight.  For example, the Idaho Uniform
Limited Liability Company Act, Idaho Code §§ 30-6-101 to -1104 (which does not govern in this
case but does apply to cases filed after July 1, 2010), provides that "[t]he failure of a limited
liability company to observe any particular formalities relating to the exercise of its powers or
management of its activities is not a ground for imposing liability on the members or managers
for the debts, obligations or other liabilities of the company."  Idaho Code § 30-6-304.  However,
the Court need not delve into the particulars of these factors because, as discussed *infra*, the relief
Trustee seeks is in the nature of substantive consolidation, not veil piercing.

MEMORANDUM OF DECISION - 16

either Debtor or BW at all.  Instead, Trustee urges the Court to treat the assets of

BW, a non-debtor entity, as coextensive with Debtor's assets in order to avoid

prepetition transfers of BW's assets.  The true essence of Trustee's claim is further

evidenced by his representation at trial that his intent is to bring the assets of BW,

as well as L & B, into Debtor's bankruptcy estate.  Trustee's approach —

collapsing the assets of a non-debtor entity into those of the Debtor — is

tantamount to a request for substantive consolidation of Debtor's estate with that

of a non-debtor, BW.

### b.    Substantive consolidation

Substantive consolidation is an equitable remedy, derived from a

bankruptcy court's general equity powers under § 105, that "enables a bankruptcy

court to disregard separate corporate entities, to pierce their corporate veils in the

usual metaphor, in order to reach assets for the satisfaction of debts of a related

corporation."  *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 764 (9th Cir.

2000) (quoting *James Talcott, Inc. v. Wharton (In re Continental Vending

Machine Corp.)*, 517 F.2d 997, 1000 (2d Cir. 1975)).  Substantive consolidation

combines the assets and liabilities of separate and distinct — but related — legal

entitles into a single fund, treating them as though they belong to a single entity;

duplicate and inter-company claims are extinguished, claims against the

consolidated debtors are satisfied from a single pool of assets, and creditors are

combined for purposes of voting on reorganization plans.  *Id.*

MEMORANDUM OF DECISION - 17

In *Bonham*, the seminal Ninth Circuit case regarding substantive consolidation, the debtor was an individual who had operated a Ponzi scheme through two closely-held, non-debtor corporations. 229 F.3d at 759. After discovering that liquidation of the debtor's personal assets would produce minimal net proceeds and that the two corporations had no material assets, the trustee filed several adversary proceedings against investors of the non-debtor corporations seeking to avoid prepetition transfers from the non-debtor corporations to those investors. The investors challenged the trustee's standing to avoid transfers made by the corporations because those corporations were not debtors in the bankruptcy proceeding. *Id.* at 759–60. The trustee responded by filing a motion for substantive consolidation of the debtor's bankruptcy estate with the non-debtor estates of the corporations. The bankruptcy court granted the trustee's motion and ordered substantive consolidation. *Id.* at 760. On appeal, the Ninth Circuit affirmed the bankruptcy court's order. *Id.* at 771.[14]

Here, as in *Bonham*, Trustee is attempting to avoid transfers made by a non-debtor entity owned and controlled by Debtor. But, rather than seeking substantive consolidation, Trustee relies upon a veil-piercing theory to support his

---

[14]  The bankruptcy court's order was first appealed to the district court, which dismissed the appeal for lack of finality upon concluding that the order was not an appealable final order. *Bonham*, 229 F.3d at 760. On appeal from the district court's order, the Ninth Circuit reversed the district court, holding that the bankruptcy court's substantive consolidation order was final and appealable, and remanded with instructions to affirm the bankruptcy court's order. *Id.* at 771.

MEMORANDUM OF DECISION - 18

assertions under § 548(a).  While substantive consolidation includes a veil-piercing element, it is more than that.  It has potential economic consequences for both the entity being consolidated into the bankruptcy estate, as well as that entity's creditors.  As a result, "resort to consolidation should not be Pavlovian, but . . . should be used sparingly," with a heightened degree of due process and due consideration for the harm or economic prejudice that such a remedy would occasion.  *Bonham*, 229 F.3d at 767 (quoting *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 519 (9th Cir. 1988) and *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060, 1062–63 (2d Cir. 1970)); *see also In re Luth/In re Worley Grain Co., Inc.*, 28 B.R. 564, 566–67 (Bankr. D. Idaho 1983).[15]

Though Trustee effectively seeks substantive consolidation, he did not plead substantive consolidation.  Nor did Trustee present evidence sufficient to meet the requirements for such extraordinary relief.  Therefore, Trustee's claim to consolidate the assets of BW into Debtor's bankruptcy estate fails and will be dismissed.[16]  As a result, Trustee's cause of action to avoid BW's prepetition

---

[15] When determining whether substantive consolidation is appropriate, the Court must consider "(1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit *all* creditors."  *Bonham*, 229 F.3d at 766 (emphasis added) (quoting *Reider v. Fed. Deposit Ins. Corp. (In re Reider)*, 31 F.3d 1102, 1108 (11th Cir. 1994)).

[16] To the extent Trustee has asserted separate, independent causes of action against BW
(continued...)

MEMORANDUM OF DECISION - 19

transfers to L & B will also be dismissed because those transfers were not transfers

of Debtor's property.[17]

### B.   Denial of discharge under § 727(a)

#### 1.   Section 727(a)(2)(A)

Trustee further seeks from the Court an order denying Debtor's discharge

under § 727(a)(2)(A).  Section 727(a)(2)(A) provides that, in a chapter 7 case,

> (a) The court shall grant the debtor a discharge, unless —
> . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an
> officer of the estate charged with custody of property under [title 11],
> has transferred, removed, destroyed, mutilated, or concealed, or has
> permitted to be transferred, removed, destroyed, mutilated, or
> concealed —
> (A) property of the debtor, within one year before the date of the filing
> of the petition.

Plaintiff's burden of proof on an objection to discharge under § 727(a)(2) is

preponderance of the evidence.  *See Wolkowitz v. Beverly (In re Beverly)*, 374

B.R. 221, 243 (9th Cir. BAP 2007).

Trustee contends that Debtor's prepetition transfers — the quitclaim deed

to Gregerson, deposit of the $10,000 check in the L & B account, removal of

---

[16] (...continued)
and L & B on a "veil-piercing" theory, those claims will also be dismissed for the reasons
discussed above.

[17]   The Court notes in passing that if Trustee had prevailed in consolidating BW and L &
B into Debtor's bankruptcy estate, avoidance of the transfers from BW to L & B would be
unnecessary because any assets held by L & B at the time of filing (*e.g.*, the vehicles and trailer
transferred to L & B prepetition) would have also been included in Debtor's bankruptcy estate.

MEMORANDUM OF DECISION - 20

Debtor's name from the certificates of title for the Yamaha and Honda motorcycles, and the transfer of the vehicles and trailer from BW to L & B — also support a denial of Debtor's discharge under § 727(a)(2)(A).

First, the Court will dismiss Trustee's § 727(a)(2)(A) claim as to the transfers from BW to L & B because those transfers were not of Debtor's property, but of property owned by BW, as discussed and determined *supra*. The record clearly demonstrates, however, that the remainder of the subject transfers were both of Debtor's property and occurred within one year before Debtor filed his petition.  Thus the question is whether those transfers were made with "intent to hinder, delay, or defraud" creditors.  The Court finds that they were.

The § 548(a)(1)(A) fraudulent transfer and § 727(a)(2) denial of discharge provisions share the requirement of "intent to hinder, delay, or defraud" creditors. Although § 548(a)(1)(A) requires "actual intent" while § 727(a)(2) requires only "intent," the Ninth Circuit has used "intent" and "actual intent" interchangeably, making no meaningful distinction between the two.  *See Beverly*, 374 B.R. at 243 (citing *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992) and *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)).  Additionally, the burden of proof under § 548(a)(1)(A) and § 727(a)(2) is the same — preponderance of the evidence.  Based on the Court's findings and analysis regarding Trustee's claims under § 548(a)(1)(A) *supra*, the

MEMORANDUM OF DECISION - 21

Court concludes that Trustee has met his burden under § 727(a)(2)(A).[18]

Therefore Debtor's discharge will be denied.[19]

### 2.      Section 727(a)(2)(B)

Trustee also seeks a denial of Debtor's discharge under § 727(a)(2)(B).

Section 727(a)(2)(B) provides for the denial of a debtor's discharge under chapter

7 where

> the debtor, with intent to hinder, delay, or defraud a creditor or an
> officer of the estate charged with custody of property under [title 11],
> has transferred, removed, destroyed, mutilated, or concealed, or has
> permitted to be transferred, removed, destroyed, mutilated, or
> concealed —
> . . .
> (B) property of the estate, after the date of the filing of the petition.

Trustee contends that Debtor's post-petition Lease transaction involving the

Garrity Property — effected through Gregerson — involved the transfer and

concealment of property of the estate with intent to hinder, delay, or defraud

creditors and Trustee.

It is undisputed that the Lease was executed the day after Debtor filed his

---

[18]   There are circumstances where avoidance of a fraudulent transfer under
§ 548(a)(1)(A) may not necessarily compel a denial of discharge under § 727(a)(2)(A).  For
example, if a transfer occurred sometime between one and two years before filing, that transfer
may be subject to avoidance under § 548(a)(1)(A) but does not give rise to a denial of discharge
cause of action under § 727(a)(2)(A).  However, such is not the case here.

[19]   Debtor also concealed his rights under the Canyon Outdoor Lease, which are property
of the estate, by failing to disclose those interests in his bankruptcy schedules or otherwise.
However, because the Court concludes that Debtor's discharge will be denied on other grounds, it
need not, and does not, inquire further as to whether Debtor's concealment of the Canyon
Outdoor Lease was done with intent to hinder, delay, or defraud creditors.

MEMORANDUM OF DECISION - 22

petition.  At the time of filing, Debtor's prior lease agreement with Tam and Liang had expired.  All of Debtor's property rights in the Garrity Property, including the right to use and possess the property, became property of the estate upon filing. *See* § 541(a)(1).  By having Gregerson enter into the Lease, Debtor transferred, or permitted the transfer of, the right to use and possess the Garrity Property, a right that was property of the estate.

Debtor also concealed estate property after filing his petition.  Property of the estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate."  Section 541(a)(6).  The Garrity Property was owned by Debtor and was thus clearly property of the estate.  Therefore, the rents Debtor and Gregerson collected from Tam and Liang for the lease of the Garrity Property also constitute estate property under § 541(a)(6).  However, Debtor did not include rental income from the Garrity Property in Schedule I, which was filed after the December 13 Lease was executed.[20]  Nor did Debtor report or disclose to the Court, the chapter 13 trustee, or Trustee the Lease or the rental income generated therefrom.  Additionally, Debtor did not disclose the $16,000 payment he received in exchange for the December 13 Option to purchase the Garrity Property, although those funds also constituted "proceeds, product, offspring, rents, or

---

[20]  Debtor  never filed a Chapter 13 "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" (Official Form 22C) before his case was converted to chapter 7.

MEMORANDUM OF DECISION - 23

profits of or from property of the estate" and were thus estate property under § 541(a)(6).[21]

The final inquiry under § 727(a)(2)(B) is whether execution of the Lease and concealment of the Option payment and rental income were accompanied by the requisite intent to hinder, delay, or defraud creditors. The circumstances presented convince the Court that Debtor acted with such intent.

Debtor contends that he entered into the Lease with Liang in the "ordinary course of business," and that he had no intent to hinder, delay, or defraud creditors. Indeed, he claims that his intent was to fund his chapter 13 plan, at least in part, with the rental income from the Garrity Property Lease. The Court finds Debtor's arguments unpersuasive.

Section 1304 permits a chapter 13 debtor that is self-employed to operate his business unless the court orders otherwise. This permission includes the ability to enter into transactions, including the sale or lease of property of the estate, if in the ordinary course of business, without notice or a hearing. *See* §§ 363(c)(1) and 1304(b).

A determination of whether a transaction falls inside or outside the ordinary course of business is a question of fact. *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 879 (9th Cir. 2008). It requires inquiry into the nature of

---

[21] Even if Gregerson could deal for Debtor — as an agent (as was argued) or otherwise — the fact remains that the Garrity Property and its proceeds were property of the estate.

MEMORANDUM OF DECISION - 24

industry practice and into a debtor's prepetition business conduct.  Courts apply

two tests for determining whether a transaction is within the ordinary course of

business for purposes of § 363(c)(1) — the vertical dimension test (sometimes

characterized the "creditor's expectation test"), and the horizontal dimension test.

*Id.*  A transaction that meets both tests is in the ordinary course of business.  *Id.*

The vertical dimension test "views the disputed transaction from the

vantage point of a hypothetical creditor and inquires whether the transaction

subjects a creditor to economic risks of a nature different from those he accepted

when he decided to extend credit."  *Id.* (quoting *Burlington N. R.R. Co. v. Dant &*

*Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir. 1988)).  In

determining whether a transaction meets this test, courts often compare the

debtor's prepetition business practices to his postpetition business activities.  *Id.*

"Under the horizontal dimension test, the question is 'whether the

postpetition transaction is of a type that other similar businesses would engage in

as ordinary business.'"  *Id.* at 880–81 (quoting *Dant & Russell*, 853 F.2d at 704).

The purpose of this test is "to assure that neither the debtor nor the creditor did

anything abnormal to gain an advantage over other creditors."  *Id.* at 881.

The Court finds that the Lease transaction was not made in the "ordinary

course of business."  Though Debtor is the undisputed owner of the Garrity

Property, Gregerson was listed as "owner" of the Garrity Property in the

December 13 Lease and Option, and it was Gregerson, not Debtor, who executed

MEMORANDUM OF DECISION - 25

each of those documents.  This was despite Gregerson's testimony that Debtor was

personally present when the Lease and Option were executed, and despite the

previous agreements with Tam and Liang, in which Debtor identified himself as,

and signed as, "owner" of the Garrity Property.  Debtor claims that he authorized

Gregerson to sign the Lease and Option as his agent, yet tellingly he provided no

cogent explanation as to why such authorization was needed given he was present

when the documents were executed.

Furthermore, Debtor did not disclose the post-petition Lease transaction or

the income generated from that transaction to the chapter 13 trustee, Trustee, or

this Court.[22]

The unusual structuring of the Lease transaction, when coupled with the

omission of rental income in Schedule I and Debtor's subsequent failure to

disclose or report the Lease transaction, Option payment, and rental income,

manifest an intent to hinder, delay, or defraud creditors and the trustee.  In

particular, the failure to disclose the rental income, either in Schedule I or

otherwise, belies Debtor's contention that his intent was to fund a chapter 13 plan

with those funds.  Instead, the evidence suggests, and the Court finds, that

---

[22]  A chapter 13 debtor engaged in business under § 1304 is required to file with the court
and the United States trustee periodic reports and summaries of the operation of the business,
including a statement of receipts and disbursements.  *See* § 1304(c) and § 704(a)(8).  No such
reports or summaries were filed by Debtor in this case.  Indeed, even at trial Debtor was unable to
provide a detailed accounting of how the $16,000 Option payment and $8,750 in rental income
had been spent.

MEMORANDUM OF DECISION - 26

Debtor's intent was to conceal the income from the Option and Lease, thereby

shielding it from the reach of creditors in Debtor's bankruptcy case.

Consequently, Debtor's discharge will also be denied under § 727(a)(2)(B).

**CONCLUSION**

Based on the foregoing, Debtor will be denied discharge of his debts under

§ 727(a)(2)(A) and § 727(a)(2)(B).  Further, Trustee may avoid the transfers of

Debtor's interest in the Orchard Property, the $10,000 gift from Kenneth Wheeler,

and the 1999 Yamaha, 2003 Honda, and 2006 Honda motorcycles under

§ 548(a)(1)(A).  The remainder of Trustee's claims will be dismissed.

Trustee shall submit a judgment and order consistent with this Decision.

DATED: February 11, 2011



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 27